UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

TIFFANY BARRINGER, as Mother, )
Next of Kin to and as Administrator of the )
Estate of PEYTON BARRINGER, )
 )
    Plaintiff, ) 1:23-CV-257-KAC-MJD
 )
v. )
 )
SARA A. JONES, )
 )
    Defendant.

**MEMORANDUM OPINION AND ORDER**

This case is before the Court on Defendant Sara A. Jones's "Motion for Summary Judgment" [Doc. 30]. For the following reasons, the Court grants Defendant's Motion.

## I.     Background[1]

Peyton Barringer alternated living in Georgia with his biological mother, Plaintiff Tiffany Barringer, and in Tennessee with his biological father, Shawn Jones,[2] and stepmother, Defendant [*See* Doc. 34-1 at 11 (Deposition of Sara A. Jones ("Jones Dep.") 10:10-13)]. Plaintiff and Mr. Jones had a custody agreement providing, as relevant here, that Mr. Jones maintained child support obligations until (1) Peyton "reache[d] the age of eighteen" or, (2) if Peyton turned eighteen (18) while attending high school, until (a) Peyton graduated high school or (b) turned twenty (20) years old, whichever was earlier [Doc. 34-2 at 7 ("Custody Agreement"

---

[1] Because Plaintiff Tiffany Barringer is the nonmoving Party, the Court describes the facts in the light most favorable to her. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).
[2] Mr. Jones is not a party in this case.

¶ 5)]. Peyton turned eighteen (18) on June 17, 2022 [*See id.* at 3]. But it appears that he was still in high school at that time [*See* Doc. 34-1 at 21 (Jones Dep. 21:15-23)].

Peyton "struggle[ed] with his mental health" [*See id.* at 23 (Jones Dep. 23:3-10)]. In October 2021, Peyton attempted to take his own life by overdosing on insulin [*See id.* at 19-20 (Jones Dep. 19:16-20:13)]. In December 2021, Peyton told Mr. Jones about this attempt, and Mr. Jones informed Defendant the same day [*Id.* at 19 (Jones Dep. 19:16-23)]. Mr. Jones, Plaintiff, and Defendant communicated to establish a plan to help Peyton [*Id.* at 20-21 (Jones Dep. 20:24-21:11)]. Defendant and Mr. Jones discussed Peyton receiving therapy [*Id.* at 42 (Jones Dep. 42:4-6)]. Peyton and Mr. Jones thereafter scheduled therapist appointments, and Mr. Jones, who it appears also used insulin, began taking his insulin with Peyton [*Id.* at 41-42 (Jones Dep. 41:1-42:20)]. Defendant's involvement with Peyton's therapy was limited, but she once suggested to Peyton that switching therapists was an option if he did not like a particular therapist [*Id.* at 39-40 (Jones Dep. 39:21-40:5)]. In some instances, though, Defendant was not aware of what therapist conducted the therapy sessions [*See id.* at 40 (Jones Dep. 40:20-24)].

Defendant had observed Peyton "being unable to sleep" normally since at least 2020 [*Id.* at 23, 45 (Jones Dep. 23:11-23, 45:13-19)]. Defendant recognized that Peyton was "overwhelmed by life in general" and seemed depressed since 2021, but this was "normal" for Peyton [*Id.* at 41 (Jones Dep. 41:8-24)]. Defendant agreed that "[g]iven that he [Peyton] had depression . . . it would be reasonable to consider that he might be at risk for suicide" [*Id.* at 96-97 (Jones Dep. 96:20-97:1)]. But Defendant "never observed" any particularly acute behavior that made her "fearful" that Peyton would attempt suicide again [*Id.* at 24 (Jones Dep. 24:6-18)]. And Peyton "[d]id not share" with Defendant "any things that were troubling him" [*Id.* at 12-13 (Jones Dep. 12:16-13:1)]. Peyton and Defendant did not have a "close relationship" because

2

Defendant was "the stepmom" [*Id.* at 12 (Jones Dep. 11:2-9)]. He was "pretty reserved and private" [*Id.* at 12-13 (Jones Dep. 12:16-13:1)].

On the evening of November 7, 2022, Peyton was staying with Mr. Jones and Defendant in Tennessee [*See id.* at 90 (Jones Dep. 90:20-24)]. Defendant brought Peyton food for dinner and had a conversation with him about a new bathroom rug [*Id.*]. Defendant, Peyton, and Mr. Jones talked about a new alarm clock Mr. Jones bought for Peyton and Peyton's therapy session the next day [*Id.*]. After a "[g]ood night" and "see you in the morning," Peyton went to his bedroom [*See id.* at 91 (Jones Dep. 91:2)]. To Defendant, "there was nothing off about [Peyton] that day" [*Id.* at 47 (Jones Dep. 47:20-24)].

Tragically, sometime between the evening of November 7, 2022 and the next morning, Peyton found a .22 caliber rifle and used it to take his own life [*See id.* at 28, 104 (Jones Dep. 28:20-22, 104:20-24)]. Defendant found Peyton in his bedroom [*Id.* at 100 (Jones Dep. 100:6-23)]. Shortly after Peyton's death, Defendant deleted text messages between her and Peyton [*See id.* at 128-29 (Jones Dep. 128:14-129:3)]. Later, on January 13, 2023, Plaintiff's attorney sent Defendant a notice informing her that she should preserve all information related to Peyton's death [Doc. 39-1 at 4].

On November 6, 2023, Plaintiff filed a complaint [Doc. 1], asserting that Defendant's negligence caused Peyton's death. Thereafter, Defendant moved for summary judgment, arguing that she is entitled to judgment as a matter of law because Plaintiff cannot show proximate causation [*See* Doc. 30 at 1]. Plaintiff opposed [*See* Docs. 32, 40]. Defendant replied [Doc. 39].

II. **Legal Standard**

Federal Rule of Civil Procedure 56 provides that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is

3

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the facts in the light most favorable to the nonmoving party and draws all reasonable inferences from those facts in her favor. *See Matsushita*, 475 U.S. at 587. The moving party bears the burden of demonstrating that no genuine dispute of material fact exists. *See Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 323 (6th Cir. 2023) (citation omitted).

Once the moving party has met this burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *See Zakora v. Chrisman*, 44 F.4th 452, 464 (6th Cir. 2022) (quotation omitted). A "party may not avoid summary judgment by resorting to speculation [or] conjecture." *K.V.G. Props., Inc. v. Westfield Ins. Co.*, 900 F.3d 818, 823 (2018) (quotation omitted). Instead, "[a] genuine issue of material fact exists" only if "there are disputes over" specific facts "that might affect the outcome of the suit under the governing law." *See Regions Bank v. Fletcher*, 67 F.4th 797, 802 (6th Cir. 2023) (citation and quotation omitted). The Court does "not weigh the evidence or make credibility determinations." *See Smith v. City of Toledo*, 13 F.4th 508, 514 (6th Cir. 2021). Even so, "the mere existence of a scintilla of evidence in support of" a nonmovant's position is "insufficient" to overcome a summary judgment motion. *See Bennett*, 86 F.4th at 323 (citation omitted).

### III. <u>Analysis</u>

Where, as here, a federal court exercises diversity jurisdiction, "state law governs substantive issues and federal law governs procedural issues." *See Greer v. Strange Honey Farm, LLC*, 114 F.4th 605, 613 (6th Cir. 2024).[3] To prove a prima facie case of negligence under

---

[3] Plaintiff notes that Tennessee courts grant movants summary judgement as to proximate cause if "only one possible conclusion" exists given the facts [Doc. 40 at 8-9 (citing *Cotten v. Wilson*, 576 S.W.3d 626, 638 (Tenn. 2019))]. But assessment of entitlement to summary judgment is procedural, not substantive. Federal law therefore controls. *See Biegas v. Quickway Carriers,*

4

Tennessee law, a plaintiff must show that the: (1) defendant owed plaintiff a duty of care, (2) defendant breached that duty, (3) plaintiff sustained an injury or loss, (4) defendant's conduct was the cause in fact of the injury or loss, and (5) defendant's conduct was the "proximate, or legal, cause" of the injury or loss. *See Cotten*, 576 S.W.3d at 637 (citation omitted).

Proximate cause is a three-part test. *Id.* at 638. **First**, the defendant's conduct "must have been a 'substantial factor' in bringing about" the plaintiff's harm. *Id.* (citation omitted). **Second**, there must be "no rule or policy that should relieve the wrongdoer from liability." *Id.* **Third**, "a person of ordinary intelligence and prudence" must have been able to reasonably "foresee[] or anticipate[]" the "harm giving rise to the action." *Id.* "Foreseeability is the crucial factor in" this inquiry because where a defendant "could not have reasonably foreseen the harm," "there is no proximate cause and thus no liability." *Id.* (quoting *King v. Anderson Cnty.*, 419 S.W.3d 232, 246 (Tenn. 2013)). A plaintiff "must show that the injury was a reasonably foreseeable probability, not just a remote possibility." *Id.* (quoting *King*, 419 S.W.3d at 248). Tennessee courts are reluctant "to recognize suicide as a proximate consequence of a defendant's wrongful act." *See id.* at 639 (citing *Watters v. TSR, Inc.*, 904 F.2d 378, 383 (6th Cir. 1990)). Indeed, Tennessee courts "generally h[o]ld that suicide" constitutes a superseding event where the suicide "was a willful, calculated, and deliberate act of one who has the power of choice." *Id.* (cleaned up).

---

*Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) ("[Q]uestions relating to the availability of summary judgment, such as whether there is a disputed issue of fact that is sufficient to defeat the motion, are procedural."); *see also* Charles Wright, Arthur Miller, and Mary Kane, *Fed. Prac. and Proc.* § 2712 n. 39 (4th ed. 2025) ("Federal courts sitting in diversity may grant summary judgment . . . even if the state would require the judge to submit an identical case to the jury.").

5

But a suicide is not always a superseding event. *Id.* at 642. As relevant here, Tennessee law recognizes an exception where a suicide "occurs in a custodial context and" is "the foreseeable harm that shapes a defendant's duty." *Id.* at 643 (citation omitted). This custodial exception generally applies in prison, asylum, and hospital contexts. *See id.*; *see also Rains v. Bend of the River*, 124 S.W.3d 580, 594 (Tenn. App. Ct. 2003) (collecting cases). The Tennessee Supreme Court, however, has considered this exception in other contexts, focusing on the amount of "control" a defendant had over a decedent. *See Cotten*, 576 S.W.3d at 649 n.24. And even where a case does not squarely fit into an exception, a defendant may be liable if "the decedent's suicide was a reasonably foreseeable probability naturally resulting from the defendant's conduct." *Id.* at 647.

Here, Defendant is entitled to summary judgment because (1) the custodial exception does not apply and (2) Peyton's suicide was not reasonably foreseeable. The Court addresses each argument in turn.

***First***, the custodial exception is inapplicable. Plaintiff argues that Peyton "was in the legal custodial care of his father ***and the defendant***" due to the Custody Agreement between Plaintiff and Mr. Jones [Doc. 40 at 7 (emphasis added)]. Reading the relevant portion of the Custody Agreement in the light most favorable to Plaintiff, though, it shows only that ***Mr. Jones*** was responsible for child support obligations [Doc. 34-2 at 6]. And even if the Court could read into the Custody Agreement additional duties ***Mr. Jones*** owed, that would do nothing to show that ***Defendant*** had any duties under the Agreement. The Custody Agreement does not mention Defendant [*See id.* at 2-12].

Plaintiff points to no other facts showing that Defendant had "control" over Peyton for purposes of the custodial exception. Plaintiff argues that Defendant "facilitated Peyton's father to

6

make all necessary calls to schedule medical appointments" for Peyton [Doc. 40 at 8]. But even reading the record in Plaintiff's favor, the facts do not support that contention. The record shows that Defendant discussed with Mr. Jones the possibility that Peyton would attend therapy, not that she directed or "facilitated" Mr. Jones organizing such treatment [*See* Doc. 34-1 at 42 (Jones Dep. 42:4-6)]. Peyton and Mr. Jones scheduled Peyton's appointments [*Id.* at 41 (Jones Dep. 41:1-5)]. Defendant merely once suggested to Peyton that switching therapists was an option [*Id.* at 39-40 (Jones Dep. 39:21-40:5)]. Put differently, **Peyton** could choose his therapist. Defendant did not organize or control these sessions; she was not even aware of which therapist conducted some sessions [*See id.* at 40 (Jones Dep. 40:20-24)].

More fundamentally, Peyton was an adult. Under Tennessee law, Peyton became a legal adult on June 17, 2022, when he turned eighteen (18). *See* Tenn. Code Ann. § 1-3-105(a)(1). Plaintiff herself understood that this prevented others from controlling his medical treatment [*See* Doc. 34-1 at 182 (stating that because Peyton "was 18" Plaintiff "could not send him into patient therapy" after a hospital discharged Peyton from an intensive care unit)]. These facts do not support the inference that Defendant had "control" over Peyton's medical treatment sufficient to trigger the custodial exception. *See Cotten*, 576 S.W.3d at 649.[4]

***Second***, there are not sufficient facts to create a genuine dispute regarding whether "a reasonably foreseeable ***probability***" existed that Peyton would commit suicide at the relevant

---

[4] Plaintiff, perhaps inadvertently, appears to argue that Peyton and Defendant had a "special custodial relationship" and not merely a "custodial" relationship [Doc. 40 at 7]. Tennessee courts recognize an exception to the suicide rule for "special relationships." *See Cotten*, 576 S.W.3d at 649. But this exception generally applies only to relationships between a decedent and his or her medical provider. *See id.* (citing *White v. Lawrence*, 975 S.W.2d 525, 531 (Tenn. 1998)). Therefore, to the extent Plaintiff intended to argue for the application of the special-relationship exception, that argument lacks merit.

time. *See id.* at 653 (emphasis added). The facts show that Defendant (1) was aware of Peyton's prior suicide attempt more than a year earlier, (2) observed that some of Peyton's tendencies appeared not to change from 2021 to 2022, and (3) understood that given Peyton's depression, "it would be reasonable to consider that he might be at risk for suicide" [Doc. 34-1 at 96-97 (Jones Dep. 96:20-97:1)]. But even where a decedent attempted suicide previously, a suicide is not reasonably foreseeable when the decedent did not display an "abnormal," "outsized, suicidal response to the various stressors in" the decedent's life. *See Cotten*, 576 S.W.3d at 651. The conduct Defendant observed was "normal" for Peyton [*See* Doc. 34-1 at 41 (Jones Dep. 41:8-24)]. And Defendant "never observed" any specific behavior that made her "fearful" that Peyton would commit suicide [*Id.* at 24 (Jones Dep. 24:6-18)]. Without more, knowledge of Peyton's suicide attempt a year earlier and ongoing mental health challenges is not legally sufficient to establish that his suicide was reasonably foreseeable [*See, e.g.*, Doc. 34-1 at 41 (Jones Dep. 41:16-24)]. *See Cotton*, 576 S.W.3d at 651; *see also id.* at 653 (approvingly citing *Chalhoub v. Dixon*, 788 N.E.2d 164 (Ill. App. Ct. 2003) and *Johnstone v. City of Albuquerque*, 145 P.3d 76, 85 (N.M. Ct. App. 2006)).

In resisting summary judgment, Plaintiff also argues that Defendant's "intentional destruction" of her text messages with Peyton is itself "sufficient to create a genuine dispute of material fact" [Doc. 40 at 4]. But this argument fails. **First**, Plaintiff does not even explain why she believes the deletion of text messages is independently sufficient to avoid summary judgment [*See id.*]. **Second**, even presuming that Plaintiff means to seek denial of summary judgment as a sanction based on Defendant's "spoliation" of evidence, that request would fail. "Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence ***in pending or reasonably foreseeable***

8

*litigation*." *Billiter v. SP Plus Corp.*, 329 F. Supp. 3d 459, 465-66 (M.D. Tenn. 2018) (emphasis added). To establish spoliation, a plaintiff must show that a defendant had an obligation to preserve the evidence at the time the defendant destroyed the evidence, and that the defendant destroyed the evidence "with a culpable state of mind." *Beaven v. U.S. Dep't of Just.*, 622 F.3d 540, 553 (6th Cir. 2010) (quotation omitted).

Here, Plaintiff points to no facts suggesting that Defendant deleted the text messages between her and Peyton while she had a legal obligation to preserve them. In fact, the record shows the opposite; Defendant deleted the text messages before Plaintiff's counsel notified her of impending litigation [*Compare* 34-1 at 128 (Jones Dep. 128:14-20) *with* Doc. 39-1 at 4]. And even putting that aside, there are no specific facts showing that Defendant had a culpable state of mind at the time she deleted those messages. Plaintiff has therefore failed to show spoliation— let alone that the Court should deny summary judgment as a sanction for any spoliation. *See Beaven*, 622 F.3d at 553.

### IV. Conclusion

The loss of Peyton's life is tragic. But Defendant was not the proximate cause of that loss. For the reasons above, the Court **GRANTS** Defendant Sara A. Jones's "Motion for Summary Judgment" [Doc. 30] and **DISMISSES** this action. An appropriate judgment shall enter.

SO ORDERED.

_____
KATHERINE A. CRYTZER
United States District Judge

9